81881 Easthampton Congregational Church v. The Church Mutual Insurance Company. Mr. Egan, good morning. Good morning. May it please the Court. I'm John Egan. I represent Church Mutual Insurance Company, the appellant in this case. The district court in this case committed error in two ways here. First, in determining that the collapse of the church ceiling that's the subject of this insurance dispute was caused by decay, the court adopted and applied an unreasonably overbroad and unreasonably overinclusive definition of that term that would result in virtually unlimited coverage for all collapses, which is intended on the face of the policy and in the text of the policy to be limited only to certain enumerated causes. You didn't define decay in any way in your policy, did you? It is not. And so isn't a dictionary definition a reasonable way to go? It is. What the courts instruct us to do first when a term of art, a word, a phrase, or any term in a policy is not specifically defined is to apply that word in its ordinarily understood meaning in the context of the portion of the policy in which that term is used, the ultimate goal being a harmonious reading of the coverage parts of the policy. I'm sorry. I thought we looked at the entire policy, not just the portion of the policy where the phrase is used. We do. But the context in which that word or phrase is used is our first point of reference. In this particular case, the word decay is used in a portion of the policy that deals specifically with physical causes of a collapse that would be included within the additional coverage for collapse provision of the policy. Which you have here. Yes. You have the property of the wood in relation to the surface of the nail, which changes over time. Correct. And so it seems to me that even within the context, it's a pretty good argument to the effect that the definition used by the court below was within the range of reasonable definitions. And if that is the case, doesn't the Massachusetts rule basically end this case in the sense that if there is a range of possibilities, you accept the possibility put forward within that reasonable range by the policy holder? Broadly stated, that's correct. The problem with that is that the definition used here is so broad and so over-inclusive that it basically subsumes the entire definition of collapse in that coverage part of the policy. If decay is defined, as it is in this case, to be a gradual decline or deterioration in strength or soundness, and we don't dispute that that's a logical, rational definition for the word decay in the abstract, but if it's used in the context of this coverage part, then that effectively means that every collapse was caused by decay as defined by the district court. And if this collapse is deemed to have been caused by decay, then it's hard to imagine any collapse not being caused by decay as so defined. Structures collapse because they no longer have the strength or soundness not to collapse. It's a definitional circle. Your company provided this additional coverage. By the way, does it cost more? No. Well, there's nothing in the record to that effect, but it's a standard provision. There's no reason to think that it would have cost any more. Well, that's interesting to me that it's a standard provision. But if you wanted to exclude the parade of horribles, you could have done that, and yet you don't do it. And absent that, it does seem to me this is within the range of reasonable possibilities. Well, it's always possible to go back and look at the text of a policy and to wonder if we could have defined our way out of it in the first instance. Well, that's why litigation counsel frequently provides advice to the client about changes in language. That's correct. And that's why sometimes the words or phrases in a policy wind up defined in later versions that weren't originally defined. It's our position that the word decay in the context of this policy must mean something other than the mechanical failure that resulted in the collapse of this ceiling in this case. Well, you say mechanical failure, but in your B section, 1B section, you say decay hidden from view. Correct. Yes, there's no argument that what was happening here was hidden from view. No, you're right. That over time, wood tends to shrink, and if you use smooth nails as opposed to grooved nails, you will have less adhesion between the nail and the wood. And why is that not a reasonable definition of what is decay? Because it's a gradual loosening of the material around the fastener, and that's a form of decay, it seems to me. Well, that's certainly the district court's conclusion. It's not just a compaction or contraction of the wooden material. It's successive expansion and contraction with changes in temperature and humidity, cyclical as the expert referred to it. The result is that it alternatively grips and then releases, grips and then releases the nail that's been embedded into it, that's now holding off five or six additional layers of added on ceiling material. And the result is that that nail eventually gives way. No, but you kind of make the argument, or I thought you were intending to make, that given seasonal expansion and contraction and so on, that by this definition, there would have been decay on the sort of the very first year that the nails were holding anything up. And in fact, I think the record was that there was 60 years of expansion and contraction combined, to be sure, with added weight before the decay as defined by the court became operative. Yes, it was a gradual process. So there was a change over time as well as a change from spring to fall. Well, the change, such as it was over the course of time, was the loosening of the nails that held the original layer of ceiling material in place. And we don't have measurements as to how incrementally those changes were from season to season. We knew they didn't, even with the added weight, they did not become crucial for, what was it, 60 years, I think, from the original installation? I think the suggestion in the record, and the record's a little vague on this, but I think the suggestion in the record is that the original ceiling may have been 60 years old and that the successive layers may have been... Well, as I understand the record, there were two successive layers, and the second of the two successive layers was some time before the collapse occurred, I think some extended time before. And as I understand your expert's testimony, was that the first additional layer was not attached to the joist. It was attached to the ceiling. Correct. Which was the second additional layer. And so ultimately what happened here, it seems to me, is that we all agree that the wood shrank and the ceiling finally fell. And that seems to me that how else can you term it, given the use of the word decay as you have used it, other than that it falls in what the district court said it fell into. Well, again, if the definition that's used by the district court is such that it eliminates whatever limitation there may have been intended in the language of the coverage part in the first instance, then the cases instruct us not to favor language that makes other provisions of a policy effectively meaningless. I was thinking about how you might try to limit this. Suppose you said, but this coverage does not extend to any ceiling more than 20 years old. That would take care maybe of the sort of normal wear and tear argument that you're making here. It would provide you some coverage. I'm sure it could. And in retrospect, an underwriter might choose to rewrite the policy that way. The point, I think, the larger point here is that given the district court's opinion, if I were representing an insured in a case where anything collapsed, a building,  We would need some expert report that said what the expert report here did say. Over time, it's going to cause a weakening. Temperature fluctuations are going to affect the process. But any structure, literally any structure, will eventually collapse because it's lost its strength or soundness. I think your argument is that in the normal course, this happens, and therefore, it cannot be decay. That's a fair summary. Okay, thank you. Thank you, Your Honor. Good morning. May it please the court, my name is William Rose, and I represent the plaintiff, East Hampton Congregational Church. I had a great outline ready to make my argument, but you pretty much made it for me. Okay, well, here, I have a problem with the district court opinion, the magistrate judge opinion. It seems to me that we know that decay doesn't mean rot because the two terms are used in the policy. Correct. But nobody would think of this failure as a rotting. It's just the wrong word. And so I don't know that we gain much in terms of what decay means by looking to the use of the word rot elsewhere in the policy. Other than there are other circumstances where these kind of cases arise. Well, maybe if this were soaked with water, one could say it rotted, but those aren't the circumstances. That's right. So the reason why that matters is that there's two alternative definitions in the dictionary for the word decay, rot and loss of strength or soundness. And if rot is used elsewhere in the policy, that can't mean what the policy was intended to mean in this case because they wouldn't have used the terms interchangeably like that. They wouldn't have had an exclusion for rot and another exclusion for… But in actual life, the two terms are not interchangeable. Correct. And that's what the courts have found in the Joy Tabernacle and the Stamp Theater case. The definition is broader than rot when you apply the structural soundness issue. Do you know, did the church pay more for this coverage? I do not know, but my brother's right. It is a standard provision, which also works in our favor because the Stamp Theater case was decided in 2010. It's a known determination. There's like six cases cited by the district court, some of which were decided well before this case. And so if the insurance company knows that that's a standard provision and that's how it gets interpreted, they should have changed the language if they didn't want it this way. How long has the church had this policy? Well, the policy is a one-year policy. Yeah, but when did it start? I don't know that. Okay. Can I make one more point about the argument that all collapses are not going to be covered? That's simply not true. Virtually every case that we've looked at would not be covered under Massachusetts law. The Clint Denning case says that there's no degree of collapse. It's either functioning properly or it collapses. If it sags, if it cracks, if it's some form of ‑‑ I don't know that that's a response to his argument. That's a partial collapse isn't a collapse. His argument is all full collapses are going to be caused by normal wear and tear if you just give it long enough. That's true, but it's not just decay. It has to be hidden decay that the insurer doesn't know about. So if there's sagging, if there's cracking, if there's known conditions, then there's no coverage. That's what happened in the Driscoll case. This would have been a better question for your brother, but there is underwriting rules that insurance companies use when they accept a risk. And I suppose the argument can be made they accepted a risk in a much older building. Correct. And so that was something that they should have either thought about or checked out before assuming the risk. They may have paid more for coverage because it was an older. That's true. And, again, that's what happened in the Stan Theodore and Joey Tabernacle cases. Those were older buildings, and that led to the finding that there was decay. So I don't know if it's a pleasure to find out that the court has anticipated your argument and already discussed it. It's made my job easier. I appreciate it. Is there anything else you need to say? No. I rely on my papers for the rest of my argument. Thank you. Thank you. Thank you both.